**UNITED STATES of America,**
**Appellee,**

**v.**

**Robert John EVANS, Appellant.**

**No. 993, Docket 73-1029.**

United States Court of Appeals,
Second Circuit.

Argued June 25, 1973.

Decided Sept. 19, 1973.

Bancroft Littlefield, Jr., Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., and John D. Gordan, III, Asst. U. S. Atty., on the brief), for appellee.

Sheila Ginsburg, The Legal Aid Society, New York City (Robert Kasanof, New York City, on the brief), for appellant.

Before LUMBARD, HAYS, and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

Robert John Evans appeals from a judgment of conviction entered against him on March 27, 1973, in the Southern District of New York after a three-day jury trial before the Honorable Dudley B. Bonsal, United States District Judge. The indictment, filed August 16, 1972, charged Evans in one count with robbing the First National City Bank, located at 130 East 42nd Street, in New York City, in violation of 18 U.S.C. § 2113(a). The jury found the defendant guilty, and sentence was imposed by Judge Bonsal of eight years imprisonment under 18 U.S.C. § 4208(a)(2). The defendant, who is currently serving his sentence, appeals on two grounds: first that the three eyewitnesses to the robbery who identified him at trial were incompetent so to testify, or alternatively that their testimony was the product of impermissible pre-trial identification procedures and hence inadmissible,[1] and secondly that the trial court's failure specifically to instruct the jury on the dangers of eyewitness identification was reversible error. We find that these contentions are without merit, and we accordingly affirm the conviction.

The First National City Bank at 130 East 42nd Street in Manhattan was robbed at about 11:30 A.M. on July 28, 1972. The robber had been standing in line for some minutes waiting to reach the teller's window. When he reached the window, he thrust a folded piece of paper on the counter in front of the teller, Janice Weber. Miss Weber looked up at the man, unfolded and read the note, which stated, "This is a holdup your 100's, 50's, 20's Don't stall My Partner will start shooting. Don't faint or I'll shoot." Miss Weber handed over $2665 in currency to the robber. She placed the bills on the counter, looked up again and watched the man who had given her the note take the money and walk out of

---

1. There is some confusion in the defendant's briefs on the question whether his objection to the identification testimony of the witnesses is grounded solely on an argument of their incompetency, or whether it also rests on a contention that their testimony should have been excluded for being so tainted by improper pretrial identification procedures that to admit it at trial was violative of due process.

the bank. She kept the note. As the robber left, Miss Weber pushed the emergency alarm, triggering the surveillance camera located over the exit door. A photographic record was thus made of the robber leaving the bank.

During the time the robber was at Miss Weber's window, and also for several minutes beforehand, the robber was observed by two customers in the bank, Margaret Kelly and Pauline Monahan, who were standing in line at the window next to Miss Weber's. Both saw the note and money change hands, and both watched the robber leave the bank.

Before trial, the defendant moved to exclude the testimony of Misses Weber, Kelly, and Monahan, the three possible eyewitnesses to the robbery. A *Simmons* hearing[2] was held to determine whether their testimony on the issue of identification was to be excluded. (See Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 127 (1968)). John Janson, an FBI agent, testified that on the day of the robbery, in the afternoon, he had separately shown to each of the three eyewitnesses a photographic spread in an effort to identify the robber.[3] Each eyewitness was unable to make a fully positive identification, but each selected a photograph of the defendant and also one of another man as pictures of the likely suspect. (According to Janson, from the seven photographs presented, Miss Weber selected that of the defendant and that of one Neil Masotta.. Miss Kelly selected photographs of the defendant and one Larry Curtin. Miss Monahan made the same selection as Miss Kelly.) On the basis of their identification in the photographic spreads, the defendant was arrested and charged with the robbery.[4]

When the individual eyewitnesses testified at the hearing, certain inconsistencies emerged concerning just what had happened during the spreads conducted by Agent Janson. Miss Weber acknowledged she had selected the defendant's photograph, but she was not sure whether the other photograph she had picked was of Masotta or was rather "the last one," which would have been of one James Timmons. Miss Kelly testified that she had at first picked only the defendant's photograph, but on cross-examination she conceded she had picked a second, although less positively. Miss Monahan remained consistent in her selection. Each eyewitness also admitted that within the week prior to the *Simmons* hearing each had been shown either stills from the surveillance film taken of the robbery (Miss Weber) or parts of the film plus photographs of other robberies in which the defendant had allegedly been involved (Miss Kelly and Miss Monahan). Judge Bonsal denied the defendant's motion to exclude the eyewitnesses' identification testimony.

At trial, the government's case consisted of the testimony of the three eyewitnesses, the surveillance film, the expert testimony of an FBI documents examiner, and the testimony of an officer of the bank that it was insured by the Federal Deposit Insurance Corporation and that surveillance cameras were in use at the 130 East 42nd Street branch. No evidence was presented by the defendant.

At trial, Miss Weber identified the defendant as the robber and stated that she was sure of her identification, even though she also admitted to having selected not only the defendant's photo-

---

**2.** On this court's endorsement of the use of *Simmons* hearings in a situation such as the present one, see our decision in United States ex rel. Phipps v. Follette, 428 F.2d 912, fn. 1 at 913, cert. den., 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

**3.** The defendant does not contend that the spreads were unfair or that at this pre-arrest

stage they in any way violated the Supreme Court's guidelines in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**4.** The record is unclear on the extent to which the bank surveillance film was also used at this pre-arrest stage to help narrow the suspects.

graph but also that of another at the photographic spread on the day of the robbery. In addition, the presentation of the surveillance film to the jury was also made during Miss Weber's testimony, and over the defendant's objection Miss Weber was permitted by the trial court to point out during the showing of the film the location of persons and objects in the bank.[5] Miss Kelly, in her testimony, made a similar in-court identification of the defendant as the man she had seen commit the robbery. She, too, acknowledged that she had not been completely positive of her identification of the defendant at the photographic spread on the day of the robbery.[6] Miss Monahan was the third eyewitness to testify at trial. During her testimony in the morning, she was unable to identify the defendant as the man who committed the robbery. During the luncheon recess the prosecution had her view the surveillance film again, and in the afternoon she was recalled to the witness stand, over defense objection. The objection was overruled, and, her memory refreshed, she identified the defendant as the robber.

It is the defendant's initial contention that the sum of these identifications by the three eyewitnesses establishes conclusively their incompetence to testify at trial on the issue of identity. In support of his contention, the defendant argues that the identifications made in court by Misses Weber, Kelly, and Monahan were founded not upon their personal familiarity with the robber's appearance, gained at the time of the robbery, but upon their recollection of the surveillance film (which, the defendant claims, is insufficiently clear to support any identification of the robber) and other photographs shown to them by government agents.

We are unable to discern any good reason for holding that the three eyewitnesses were incompetent to testify. While it is true that "what the witness represents as his knowledge must be an impression derived from the exercise of his own senses, not from the reports of others,—in other words, must be founded on personal observation," 2 Wigmore, Evidence § 657 (3rd ed., 1940) (emphasis omitted), nonetheless it has long been established that "the result of the witness' observation need not be positive or absolute certainty . . . ; it suffices if he had an opportunity of personal observation and did get some impressions from this observation." *Id.*, § 658. These principles have been consistently applied with no less breadth in the area of testimony as to a person's identity. *Id.*, § 660. As the Supreme Court noted in Stovall v. Denno, 388 U.S. 293, 299–300, 87 S.Ct. 1967, 1971, 18 L.Ed.2d 1199 (1967): "The overwhelming majority of American courts have always treated the evidence question [of eyewitness identification] not as one of admissibility but as one of credibility for the jury." Cf. Wall, Eye-Witness Identification in Criminal Cases, 38. It is thus not surprising that the limitations which the Supreme Court has recently applied to this broad principle have been for specific purposes of protecting federal constitutional rights through the use of exclusionary rules. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Although these cases involved

---

5. There is some indication that Miss Weber claimed at this point never to have seen the surveillance film before, which may have been technically true but is not fully consistent with her testimony at the *Simmons* hearing.

6. Miss Kelly also testified that at the same spread, prior to viewing the group of seven photographs selected by Agent Janson, she had been shown a single photograph of an unknown person not, to her recollection, the defendant.

due process claims, as well as fifth and sixth amendment claims, none of them premised the exclusion of identification testimony on the *incompetency* of the particular witnesses involved. Nor do we read any of them as suggesting a limitation on the modern tendency to permit the admission of testimony as long as it is relevant, open to cross-examination, and not the fruit of illegal investigatory practices. It is not surprising, therefore, that the defendant, in his effort to establish incompetency, is unable to refer us to any cases which support his contention. In those which he briefly mentions, United States v. Barber, 442 F.2d 517 (3rd Cir., 1971), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971); and United States v. Fernandez, 480 F.2d 726 (II), (2d Cir., 1973), as in the recent Supreme Court decisions just cited, competency was unquestionably assumed by the court, and the evidentiary question was understood to center not on the capabilities and capacities of the witnesses, but on circumstances which later undermined the reliability of their otherwise admissible first-hand knowledge.

■ Here, Misses Weber, Kelly, and Monahan each observed the robber at the time of the robbery, for an adequate length of time to perceive at least his general features, his sex, stature, bearing, the color of his skin, and even his fingernails. Their observations were made under conditions of adequate light, under (at least initially) normal daytime operations. There was no mask on the robber, nor any obstruction between the observer and the suspect. Nor is there any indication that the witnesses' faculties of observation were in any way impaired. Under these circumstances, the witnesses were clearly competent. See Simmons v. United States, *supra*; Coleman v. Alabama, *supra*; Clemons v. United States, and companion cases 408 F.2d 1230 (1968) (en banc), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L. Ed.2d 567 (1969); United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir., 1970), cert. denied, 400 U.S. 908, 91 S.

Ct. 151, 27 L.Ed.2d 146 (1970); United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1972), cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); United States v. Fernandez (I), 456 F.2d 638 (2d Cir., 1972).

We turn now to the question whether the testimony of the three eyewitnesses, otherwise competent, should have been excluded for the reason that it was the result of impermissibly suggestive pretrial identification procedures and hence, in its admission at trial, violative of due process. *Cf.* Simmons v. United States, *supra.* The defendant in his reply brief specifically disclaims that he is making a "taint argument" on the basis of *Simmons, Wade,* and *Gilbert, supra,* and states that his argument is only "an evidentiary [one] which inquires whether the witnesses could, from their ability to observe, identify the robber, and thus whether the witnesses were competent to testify." However, in his principal brief, the defendant argues that "the eyewitness testimony presented by the government was improperly admitted at trial because this testimony was incompetent *and the product of unnecessarily suggestive photographic procedures.*" (Emphasis added.)

■ While, as indicated earlier, it is only recently that the Supreme Court has addressed the problem of improper eyewitness identification, *Wade, Gilbert, Stovall, supra,* and subsequent cases, the guidelines are fairly well established regarding the admissibility of in-court eyewitness identification testimony. In instances where there is no sixth amendment violation relating to the absence of counsel at a critical stage of the criminal proceedings (see United States v. Wade, *supra;* Coleman v. Alabama, *supra*), and again no such issue is raised by the defendant (*cf.* Sobel, Eye-Witness Identification § 47 (1972)), the admissibility of in-court eyewitness identification testimony is solely a question of due process. In a situation such as the present one, where various photographic identification procedures were used prior to and during trial, admissibility

depends upon a weighing of all the circumstances surrounding the use of such procedures. As the test was formulated in Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. at 971:

> [E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

The danger on which the Court was focusing, of course, was that "[r]egardless of how [an] initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Id.*, at 383–384, 88 S.Ct. at 971. Yet despite the serious risks and even more serious consequences of misidentification through the use of photographs, the Supreme Court was "unwilling to prohibit [their] employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement," noting that the technique was "used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Id.*, at 384, 88 S. Ct. at 971.

Since the *Simmons* case, there have been some instances of the exclusion of eyewitness identification testimony because of the impermissibly suggestive nature of its origin. See Foster v. California, *supra*; United States v. Sutherland (I), 428 F.2d 1152 (5th Cir., 1970), cert. denied, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972). But the procedures held violative of due process in those cases went well beyond the techniques employed in the present case.

Rather, the techniques used by the law enforcement authorities in securing an identification of Evans as the suspected robber were consonant with situations where courts have found either no violation of due process or a violation that, on a totality of the circumstances test, was harmless. In *Simmons* itself, for example, petitioner Simmons challenged the in-court identification testimony because the five bank employees who had witnessed the robbery had, on the following day, been shown photographs of himself and of a co-defendant which had been taken from the home of Simmons' mother-in-law by the police during their investigation and from which all five witnesses had been able to identify Simmons as one of the suspects. In rejecting the claim that the use of those photographs and of other photographs of Simmons shown to the eyewitnesses constituted a violation of due process, the Court, through Mr. Justice Harlan, said (390 U.S. at 384–386, 88 S.Ct. at 971):

> Applying the standard to this case, we conclude that petitioner Simmons' claim . . . must fail. In the first place, it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this instance. A serious felony had been committed. The perpetrators were still at large. . . . It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces. . . . The justification for this method of procedure was hardly less compelling than that which we found to justify the "one-man lineup" in Stovall v. Denno, *supra*.

> In the second place, there was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods

ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. Apparently, these consisted primarily of group photographs, with Simmons and Andrews [the co-defendant] each appearing several times in the series. Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.

Under these conditions, all five eyewitnesses identified Simmons as one of the robbers. . . . These initial identifications were confirmed by all five witnesses in subsequent viewings of photographs and at trial, where each witness identified Simmons in person. . . . Taken together, these circumstances leave little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some respects fallen short of the ideal. [Footnote omitted.]

This court thereafter had occasion to consider the admissibility of in-court identification testimony in United States ex rel. Phipps v. Follette, *supra,* 428 F. 2d 912 (1970), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). There, despite a finding that a post-arrest stationhouse showup was impermissibly suggestive in which the one eyewitness to a gas station robbery identified the two robbers, the in-court identification was nonetheless permitted to stand because the opportunity for the eyewitness to observe the robbers at the gas station, while he struggled with them for some 20 to 30 seconds, was deemed sufficient to surmount the taint of the showup. This court considered the *Simmons* test to be a two-fold one: that to sustain the exclusion of identifi-

cation testimony, there had to be a showing both of impermissibly suggestive procedures *and* of the substantial likelihood of misidentification. Where one or both were lacking, this court concluded that eyewitness identification testimony was to be admitted. This approach has been followed subsequently in this circuit. See United States v. Fernandez (I), *supra,* 456 F.2d 638 (1972), where identification testimony of a robbery suspect was allowed in spite of a clearly suggestive photographic spread because the witnesses had had ample opportunity at the time of the robbery (five to seven minutes in daylight) to observe the features of the defendant.[7]

While the Supreme Court has not explicitly adopted a two-step approach in applying the *Simmons* test of the totality of the circumstances, in Neil v. Biggers, *supra,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Court upheld a conviction where the one eyewitness, the victim of a rape, had over some seven months viewed suspects "in her home or at the police station, some in lineups and others in showups," and many in photographs, before identifying her attacker at a showup. The Court reaffirmed that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification,' Simmons v. United States, 390 U.S., at 384, 88 S.Ct. 967." It then went on to consider "whether . . . unnecessary suggestiveness alone requires the exclusion of evidence." Neil v. Biggers, *supra,* at 198–199, 93 S.Ct. at 381. The Court concluded:

> While we are inclined to agree . . . that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable proce-

7. In *Fernandez* (I) there was also the further evidence of a bank surveillance film.

dure where a more reliable one may be available, not because in every instance the admission of evidence of such a confrontation offends due process. [*Id.*, at 199, 93 S.Ct. at 382.]

The Court declined to apply such a rule, and went on to say:

[T]he central question [is] whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [*Id.*, at 199, 93 S.Ct. at 382.]

Weighing all the factors, the Court found no substantial likelihood of misidentification, and held that the evidence of identification was properly allowed to go to the jury. We note that other courts of appeals have sustained convictions based on eyewitness testimony in overall circumstances similar to the circumstances in the instant case. Clemons v. United States, and companion cases, *supra,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); Macklin v. United States, 133 U.S.App. D.C. 347, 409 F.2d 174 (1969); United States v. Barber, 442 F.2d 517 (3rd Cir., 1971), cert. den., 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971); United States v. Hines, *supra,* 147 U.S.App.D.C. 249, 455 F.2d 1317 (1972), cert. den., 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). See also Coleman v. Alabama, *supra,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

■ Here the three eyewitnesses were shown photographs of Evans in separate photographic spreads within hours after the robbery, while their recollections were still fresh. There is no suggestion of impropriety in the spreads themselves: no improper use of names, no distinctive characteristics about Evans's photograph as compared to those of the others. The selection by each of them of Evans's photograph, while not wholly positive, was careful and free of any marks of police pressure or suggestion. Indeed, their tentativeness is in itself evidence that the spreads were fair, for if identification is risky, some doubt is customarily to be expected. *Cf.* Hines v. United States, 133 U.S.App.D. C. 27, 408 F.2d 1230, 1242 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L. Ed.2d 567 (1969): "The most assertive witness is not invariably the most reliable one." Under these circumstances, whatever dangers of initial misidentification existed in the use of the spreads, they were not unnecessarily suggestive and consequently were not such as to require exclusion at trial. They could be adequately protected against, as the Supreme Court noted in *Simmons,* "by a course of cross-examination . . . which exposes to the jury the method's potential for error." Simmons v. United States, *supra,* 390 U.S. at 384, 88 S.Ct. at 971.

■■ The taint argument, however, does not end here. The defendant argues that in the showing of the bank surveillance film, or portions of it, to the three eyewitnesses not merely prior to trial (at a time when the defendant had been in custody for more than two months), but, in the case of Miss Monahan, during the trial as well, the chances were thereby augmented that the in-court identifications were the result of improper pretrial photographic procedures in that the potential for danger present in the use of the photographic spreads, if not realized at the beginning, was realized when compounded through post-arrest review. Furthermore, because of this increased danger, the defendant in his principal brief urges the adoption of a *per se* exclusionary rule, whereby such allegedly tainted identification would be inadmissible unless the

**1186**

government can establish by "clear and convincing evidence" either that there was in fact no taint or that the testimony was based on an untainted, independent source of identification.[8]

■ ■ We decline to adopt a *per se* rule in this case for the same reasons that the Supreme Court refused to do so in the *Simmons* case and in Neil v. Biggers. Simmons v. United States, *supra,* 390 U.S. at 383–384, 88 S.Ct. 967; Neil v. Biggers, *supra,* 409 U.S. at 198–200, 93 S.Ct. 375. And while the *post-arrest* photographic procedures employed here by the government may have been unnecessarily suggestive, we nonetheless find that, even coupled with the *pre-arrest* use of the spreads, they were not such as to constitute "a substantial likelihood of misidentification." In reaching this determination, we continue to look to the totality of the circumstances (*cf.* United States ex rel. Phipps v. Follette, *supra*), and on that basis the later viewing of the surveillance film by Misses Weber, Kelly, and Monahan was not so suggestive as to overwhelm the reliability of their identification testimony grounded in their observations made on the day of the robbery of the robber himself and of the suspects' photographs shown to them by FBI agent Janson. The film contained the likeness not of some possible suspect in the police files, but of the man who actually committed

the robbery. As a consequence, to refresh the memory of each eyewitness from that source ran a significantly smaller risk of misidentification than to refresh it from a source unrelated to the actual events. See United States v. Mackey, 474 F.2d 55 (4th Cir., 1973). It is true that permitting Miss Monahan to refresh her recollection by viewing the film during trial is questionable. But her testimony, even so refreshed, when subjected as it was to cross-examination, became practically worthless, and hence the error was also harmless in view of the strong case which the government offered as a whole. The two other eyewitnesses identified the defendant without such use of the film at trial, and, as we noted earlier, they did so in considerable detail. There was also the expert testimony of Agent Lilja that the demand note presented to Miss Weber was in the defendant's handwriting. Furthermore, the surveillance film was shown to the jury and they were able to make the comparison for themselves between the defendant, sitting before them in open court, and the person of the robber as caught by the eye of the surveillance camera at the time of the robbery.[9]

Against the totality of this evidence, it cannot be said that those portions of it which stemmed from suggestive photographic procedures reached a level which

---

8. The defendant contends, in part, that taint is established *prima facie* in instances where the government has failed to use a more reliable source of identification, for example a lineup, when such a source is available and a less reliable one, for example a showup, has been used in its stead. The defendant would further urge that in such instances only a *per se* exclusionary rule would adequately ensure the regular use of the more reliable source. This argument was specifically rejected by the Supreme Court in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We believe it does not merit further consideration. See also Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 127 (1968), at 385–386 and fn. 6, at 386; United States v. Sutherland (I), 428 F.2d 1152, 1156 (5th Cir., 1970), cert. den., 409 U.S. 1078, 93 S. Ct. 698, 34 L.Ed.2d 668 (1972).

9. During argument, this court had occasion to view the surveillance film. We believe that it contained sufficiently clear images of the robber so that the jury was properly allowed to view the film and to make their own determination of the likeness of the robber on the screen to the defendant in the courtroom. Furthermore, while it may have been somewhat out of the ordinary to have Miss Weber narrate the film during its showing to the jury, we reject the defendant's contention that she was not qualified to perform this function. She was an employee of the bank, familiar with the premises and with the general operation of the surveillance system, and present at the time the pictures were taken; she was not, as the defendant would characterize her, a lay witness masquerading as an expert.

required the exclusion of the resulting testimony. Rather, the testimony was sufficiently based on the personal knowledge of the eyewitnesses that any taint was subject to adequate exploration through cross-examination. In view of the extent, therefore, to which the eyewitnesses' testimony was challenged on cross-examination—challenges which brought out many of the minor inconsistencies and irregularities discussed earlier—there yet remained ample uncontroverted and untainted evidence of the robber's identity for the jury to consider the issue. Cf. United States v. Wade, *supra,* 388 U.S. 218, 240, 242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, *supra,* 388 U.S. 263, 272–274, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, *supra,* 388 U.S. 293, 299–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, *supra,* 390 U.S. 377, 383–386, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Neil v. Biggers, *supra,* 409 U.S. 188, 196–199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The other principal contention raised by the defendant is that it was an abuse of discretion and reversible error for the trial judge, after a request by defense counsel, to fail to give a specific charge to the jury on the dangers of eyewitness identification. The trial judge declined to give such an instruction, and limited his charge to the general issue of credibility. The defendant challenges this ruling and urges in support of his position further consideration of recent decisions of the Third Circuit and District of Columbia Courts of Appeals, and also of this court, either adopting or suggesting the use of a specific cautionary charge in criminal cases where identification of the defendant is a key issue. United States v. Barber, *supra,* 442 F.2d 517 (3rd Cir., 1971), cert. den., 404 U.S.

958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971); Salley v. United States, 122 U.S.App.D.C. 359, 353 F.2d 897 (1965); Macklin v. United States, *supra,* 133 U.S.App.D.C. 347, 409 F.2d 174 (1969). See also United States v. Fernandez (I), *supra,* 456 F.2d 638 (2nd Cir., 1972).

There is no question that identification testimony is notably fallible, and the result of it can be, and sometimes has been, "the greatest single injustice that can arise out of our system of criminal law," Gregory v. United States (I), 125 U.S.App.D.C. 140, 369 F.2d 185, 190 (D.C.Cir., 1966), cert. den., 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969), namely the conviction of the wrong man through a mistake in identity. The dangers in this area have been well chronicled, and have been the proper subject of careful attention in this and many other courts and by members of the legal profession.[10] We note, however, that there is also "formidable precedential authority which holds that it is necessary neither to instruct the jury that they should receive certain identification testimony with caution, nor to suggest to them the inherent unreliability of certain eye-witness identification." United States v. Barber, *supra,* 442 F.2d at 526. In *Barber,* for example, the court approved the use of a specific cautionary charge only prospectively, and then not in all instances. United States v. Barber, *supra,* 442 F.2d at 528. And in *Macklin,* in spite of the failure of the court below to give a specific charge, the court held that "in view of the sufficiency of the charge as a whole, we do not find error here requiring reversal," although there was in that case no request for a specific identification charge. Macklin v. United States, *supra,* 409 F.2d at 177.

---

10. See United States v. Wade, 388 U.S. 218, 228–236, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and sources there cited. See also Simmons v. United States, 390 U.S. 377, 383–384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). A recent discussion of the problems, with bibliography, is to be found in So-

bel, Eye-Witness Identification (1972). For English views on the issues of cautionary charges, see the Eleventh Report, Evidence (General), of the Criminal Law Revision Committee, §§ 199 et seq. (1972), and Glanville Williams, The Proof of Guilt, 106–124 (3rd ed. 1963).

Other courts of appeals which have considered the need for a detailed charge on the fallibility of eyewitness identification, whether to be given on request of counsel or otherwise, have decided that at most the use of such a charge is a matter of discretion, to be employed only as the circumstances of a particular case may warrant, or else that it is superfluous in the light of a proper and complete charge on the burden of proof in criminal cases and on the credibility of witnesses.[11]  McGee v. United States, 402 F.2d 434 (10th Cir., 1968), cert. den., 394 U.S. 908, 89 S.Ct. 1020, 22 L. Ed.2d 220 (1969); Cullen v. United States, 408 F.2d 1178 (8th Cir., 1969); Barber v. United States, 412 F.2d 775 (5th Cir., 1969). Moreover, even those courts which endorse the use of a specific charge would allow the trial judge wide latitude in choosing or declining to employ it, or they would look to other circumstances, such as the scope and adequacy of defense counsel's cross-examination and summation, to justify its omission. United States v. Barber, *supra*, 442 F.2d, at 528; United States v. Moss, 410 F.2d 386 (3rd Cir., 1969), cert. den., 396 U.S. 993, 90 S.Ct. 488, 24 L.Ed.2d 455 (1969); United States v. Shelvy, 148 U.S.App.D.C. 1, 458 F.2d 823 (1972); United States v. Fernandez (I), *supra*, 456 F.2d 638 (2d Cir., 1972). As Judge Friendly said in the first *Fernandez* case, *supra*, at 643–644:

> While a defendant is not entitled to a reading of all that was said about the dangers of misidentification in United States v. Wade . . ., 388 U.S. at 228–236, 87 S.Ct. at 1926, and Simmons v. United States . . ., 390 U.S. at 383–384, 88 S.Ct. at 967, we would think it reasonable that a properly drafted instruction, drawing particularly on Mr. Justice Harlan's language in *Simmons,* should be given if requested. [However, w]hether failure to do would constitute reversible error would depend upon the circumstances.

   We hold that under the circumstances of this case, particularly the full opportunity afforded to develop all the facts relevant to identification of the defendant and the careful and accurate instructions to the jury, it was not error for the trial judge to refuse to give an additional charge regarding identification.

Affirmed.

---

11. We have carefully scrutinized the trial court's charge on the general issue of credibility in this case and find it clear and thorough.