STATE of Wisconsin, Plaintiff-Respondent,

v.

Jeffrey L. DEMARS, Defendant-Appellant.†

Court of Appeals

*No. 92-0729-CR. Submitted on briefs August 14, 1992.—Decided October 14, 1992.*

(Also reported in — N.W.2d —.)

† Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *T. Christopher Kelly* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Steven E. Tinker,* assistant attorney general.

Before Brown, Anderson and Snyder, JJ.

SNYDER, J. Jeffrey DeMars appeals from a judgment convicting him of second-degree sexual assault, burglary, robbery, false imprisonment, intimidation of a victim and bail jumping. His theory of defense was that he was misidentified by the victim. He contends that by sustaining hearsay and irrelevancy objections to his questioning of police witnesses about other suspects, the trial court effectively precluded that line of questioning, thus violating his right to due process. He also claims entitlement to a new sentencing hearing, asserting that he was not allowed to review his presentence investigation report (PSI) before sentencing.

We hold that the trial court did not preclude further questioning; it simply ruled on the objections before it. We also hold that the trial court did not deny DeMars access to his PSI. We therefore affirm the judgment.

Eighty-seven-year-old Esther G. was attacked by a man who appeared at her door pretending to be answering a classified ad. The episode began when Esther G. answered her doorbell to find a man she did not recognize standing outside her screen door. He asked if it was the "Sampson" residence and if she had placed a classified ad for a motorcycle. A large motorcycle she had never seen before stood outside; the man denied it was his. As she explained that he had the wrong house, the man suddenly lunged at her, put her in a headlock and dragged her into the house.

There, he demanded money and told her that if she reported the attack he would return and kill her. He forcibly removed her pantyhose, punching her in the vagina as he did so, and used the pantyhose to tie her up. The man then cut the telephone cord and left. Esther G. later worked herself free, went to a neighbor's house and reported the incident.

Throughout the ten- or fifteen-minute ordeal, Esther G. never got a clear look at the man's full face. When she answered the door, she saw him only from the nose up because a piece of wood in the screen door obscured the lower part of his face. When he attacked her and dragged her around, he remained behind her, holding her in a chokehold so that she could not turn her head to see him. He then covered her head with a bedspread.

During the ensuing investigation, Esther G. described her assailant as being clean-shaven and having broad shoulders and dark, curly, short hair. Esther G. did not indicate that she recognized the intruder. Her niece told a deputy, however, that DeMars had been prosecuted for stealing from Esther G. five years earlier. Two detectives showed Esther G. a photo array which included DeMars' photograph; she selected DeMars' photograph as the one which looked most like the intruder.[1] Esther G. also chose DeMars' picture from a second photo array, although she again said she could not be entirely sure because she believed her attacker to be clean-shaven with short hair, and the men in the photographs, including DeMars, all had longer hair and

---

[1]The picture in the array was a 1985 photograph which showed DeMars with shorter hair than he had in 1990 when the offense occurred. Detective William Flood said he used the older photo because it more closely approximated the description Esther G. gave of the intruder.

mustaches. Finally, Esther G. selected DeMars from a line-up, again commenting that she did not recall seeing a mustache on the attacker.

DeMars pled not guilty to charges of second-degree sexual assault, burglary, robbery, false imprisonment and intimidation of a victim. At trial, DeMars' theory of defense was mistaken identity. Esther G. identified him, he contended, based on her perhaps subliminal recollection of him from their past encounter. He sought to cast doubt on Esther G.'s identification by showing that a recent motorcycle accident which injured his ribs left him too sore to strong-arm Esther G. Mainly, however, he attempted to establish that his appearance did not precisely match the description Esther G. had given: Esther G. had insisted her assailant was clean-shaven and had short hair. DeMars had a mustache and hair long enough to wear in a ponytail.

Based on information gleaned from police records obtained through discovery, DeMars' counsel also attempted to elicit testimony that other persons matching the description Esther G. gave were in the vicinity of her home about the time of the attack. Defense counsel asked Detective Mylon Fink:

Q Were you asked to investigate descriptions with regard to other people who might have been in Esther [G.'s] neighborhood at that time?

A No.

Q You don't recall being told to interview with regard to some Mexican workers who fit the physical description?

[PROSECUTOR]: Object to that as hearsay.
THE COURT: Objection sustained.

Q Were any other suspects names ever brought up to you other than Jeff DeMars?

[PROSECUTOR]: Object to that as hearsay.
THE COURT: Same ruling please.
[DEFENSE COUNSEL]: No further questions.

DeMars' attorney again attempted to pursue this avenue during the cross-examination of another detective, John Dobyns. Detective Dobyns was asked:

Q Now, when you reviewed those materials, were there some other suspects raised that there were strangers in the area on August 16, 1990?
[THE PROSECUTOR]: Object to this as being irrelevant.
THE COURT: Objection sustained.

An unrecorded sidebar conference followed that exchange. Defense counsel then proceeded with another line of questioning. The next day, after eleven more witnesses had testified, defense counsel made an offer of proof relating to the hearsay and irrelevancy objections.[2] He said that he would have shown that police reports indicated that some Mexican workers in the area matched the physical description Esther G. gave and that the police had considered as a suspect someone else who had once done work for Esther G., but that these leads never were followed up.

After a three-day trial, the jury found DeMars guilty of all charges and he appeals. More facts will be supplied where necessary.

---

[2]In the offer of proof, defense counsel stated:

I . . . would have gotten into other possible defendants in this case that the police did not follow up on. Specifically I would have gotten into the police reports indicating they were told there was some Mexican workers in the area that matched the physical description and that there was another name given of someone who had done some work for Mrs. [G.]. Those to the best of my knowledge from the police reports were never followed up.

DeMars first claims that the trial court precluded him from asking police witnesses about other suspects, thus denying him his constitutional right to present evidence in his defense. He cites *State v. Johnson,* 118 Wis. 2d 472, 348 N.W.2d 196 (Ct. App. 1984), in his support.

*Johnson* was a robbery case depending solely on identification evidence. A purse-snatcher fled into a nearby home before the victim could see his face. The home was the residence of the defendant's mother. An eyewitness identified Johnson as the culprit. Johnson argued mistaken identity. By stipulation—and thus without the jury viewing them—the court received into evidence photographs of Johnson's brother, virtually his look-alike. The trial court stated that the photographs could go to the jury room upon a request from the jury, but refused on its own to provide the exhibits. The defendant was found guilty. The court of appeals held that the photographs were essential to Johnson's defense and, since the trial court recognized that the photos properly could have gone to the jury room, the trial court's failure to give a reasoned explanation for not sending them was an abuse of discretion and a violation of Johnson's due process rights. *Id.* at 479-80, 348 N.W.2d at 200.

DeMars contends that, like *Johnson,* his, too, is a "one-witness identification case." *Id.* at 479, 348 N.W.2d at 200. We agree with that characterization,[3] but con-

---

[3]The state argues that this is a "third-party" defense case like *State v. Denny,* 120 Wis. 2d 614, 622, 357 N.W.2d 12, 16 (Ct. App. 1984). We disagree. DeMars' position is that he was misidentified; logically, then, someone else must have committed the crimes. In *Denny,* by contrast, suspicion did not focus on the defendant by virtue of eyewitness identification. Rather, the defendant attempted to exculpate himself by showing that others also had motives to kill the decedent.

clude that he attempts to take the analogy further than the facts allow. Unlike in *Johnson,* here the trial court did not preclude him from presenting evidence necessary to his defense. The trial court simply ruled on objections to the form of the questions he asked.

For example, when Detective Fink was asked whether he was told of other suspects' names or to investigate certain other leads, the court sustained the state's hearsay objections. Defense counsel responded, "No further questions." Likewise, when Detective Dobyns was asked whether police reports referenced other potential suspects in the area of Esther G.'s house on the date of the attack, the trial court sustained the state's objection that the question was irrelevant. After an unrecorded sidebar conference, the defense resumed its questioning along other lines.

The decision of the trial court concerning the admissibility of hearsay evidence generally rests within its sound discretion and will not be reversed unless that discretion is misused or is based upon an erroneous view of the law. *State v. Buelow,* 122 Wis. 2d 465, 476, 363 N.W.2d 255, 261 (Ct. App. 1984). The same is true regarding relevancy determinations. *See State v. Vander Linden,* 141 Wis. 2d 155, 163, 414 N.W.2d 72, 75 (Ct. App. 1987). DeMars argues on appeal that since the questioning involved police reports, such evidence falls within the business records exception to the hearsay rule, sec. 908.03(6), Stats. That may be true. *See Boyer v. State,* 91 Wis. 2d 647, 661, 284 N.W.2d 30, 35 (1979). DeMars did not offer this argument at trial, however, but instead abandoned that line of questioning when challenged.

██ Having said that, we will assume for the sake of discussion that the trial court's rulings were error. We conclude any error was harmless, however, because the state has shown beyond a reasonable doubt that the error did not contribute to the verdict. *See State v. Billings,* 110 Wis. 2d 661, 666-67, 329 N.W.2d 192, 194-95 (1983).[4]

The state's objections were to the form of the questions. The trial court had no duty to assist DeMars in his defense by ascertaining under which particular hearsay exception evidence was sought to be admitted. The questions were framed poorly, and they were not followed up on, rephrased or clarified. No foundation was laid for getting a police report admitted. The writer or writers of any reports were not called as witnesses.

██ The next day, defense counsel made an offer of proof in which he asserted that he would have explored the police reports. Defense counsel claimed one report indicated that "Mexican workers in the area" and "someone who had done some work for Mrs. [G.]" also were suspects and that he would have shown that the police did not follow up on these leads. The offer of proof

---

[4] We note, however, that we believe the evidence excluded as irrelevant was, in fact, relevant. In a mistaken identity case, evidence of other suspects matching the defendant's description is not irrelevant. *See State v. Johnson,* 118 Wis. 2d 472, 479-80, 348 N.W.2d 196, 200 (Ct. App. 1984). Nevertheless, we affirm the trial court's ruling because, as asked, the question sought to elicit from Detective Dobyns information from a police report prepared by someone else referring to statements made by still other persons. That is hearsay. It is well-established that if a trial court reaches the proper result for the wrong reason, it will be affirmed. *State v. Holt,* 128 Wis. 2d 110, 124, 382 N.W.2d 679, 687 (Ct. App. 1985).

fails to establish any violation of DeMars' right to present a defense, however. The record does not show that Esther G. ever claimed that her attacker was Hispanic or that she recognized him. Furthermore, whether or not the police pursued other leads vigorously—or at all—is not at issue because the police are not on trial. Thus, even if the evidentiary rulings were erroneous, the offer of proof contains nothing to convince us that DeMars would have proved his case of mistaken identity. The state has satisfied us that if anything prevented DeMars from presenting evidence in his defense, it was how his defense counsel proceeded, not the trial court's rulings. We see no abuse of discretion.

The final issue is whether DeMars was denied access to his PSI report. The trial court issued an order which read in part:

> In the Matter of Confidentiality of Presentence Reports ·
>
> The practice is that when a Presentence Investigation Report concerning a defendant has been made to the Court, a copy is furnished to the prosecuting attorney, the attorney for the defendant or the defendant if not represented by counsel for their convenience and use during the proceedings and until Judgment is entered. The report has a confidential quality and the contents of it are to be disclosed to the defendant.

DeMars argues that this "standard order" deprived him of his constitutional right to read the PSI and, therefore, that he is entitled to a new sentencing hearing. *See State v. Skaff*, 152 Wis. 2d 48, 57–58, 447 N.W.2d 84, 88–89 (Ct. App. 1989).

675

■

We disagree. In *Skaff,* the trial court forbade Skaff to read the PSI and ordered that his attorney could divulge to him only its general contents and recommendation. By contrast, here the court's comments at the sentencing hearing imply that the court contemplated that DeMars would see the PSI. The court was addressing DeMars when it stated that the PSI author "is an individual who makes this pre-sentence investigation available to me, *to you,* and to the State, *so that you have an opportunity to examine it and to challenge it."* (Emphasis added.) By expressly granting access to an unrepresented defendant, the order here does not deny access to a represented defendant such as DeMars.

While we emphasize that this case is sufficiently distinguishable from *Skaff,* we pause for a final comment. *Skaff* was decided in August 1989, nearly two years before DeMars' April 1991 sentencing. Aside from raising this complaint on appeal, there is no indication anywhere that DeMars did not see his PSI. He did not raise the matter at sentencing or object to going ahead with sentencing. If defense counsel believes the facts here raise a *Skaff* issue, the proper time to assert it would have been at the sentencing hearing. When a defendant, or defense counsel, believes an order unconstitutionally restricts the defendant's access to the PSI, we hold that the challenger has a duty to raise that claim in a timely fashion. One cannot proceed quietly with sentencing and then, on appeal, assert for the first time a *Skaff*-type violation and claim entitlement to resentencing.

*By the Court.*—Judgment affirmed.